STATE OF MAINE

KENNEBEC, ss.



SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-02-217

MAINE EYE CARE ASSOCIATES,
P.A.,

Plaintiff

v.

TIMBER H. GORMAN, M.D.
and G. MADISON CRAVEY, M.D.,

Defendants

**DECISION AND JUDGMENT**

DEC 7 2004

This matter came on for trial before the court without a jury. All parties appeared with their attorneys. The court has considered all of the testimonial and other evidence presented. The litigation began with a multi-count complaint and multi-count counterclaim. As the result of motions to dismiss and for summary judgment, all counts of the counterclaim were disposed of prior to trial. At trial, the plaintiff withdrew its counts V and VI, leaving the court with two primary groupings of issues. First, there is a question of whether defendant Dr. Timber Gorman (Gorman) violated a non-competition agreement she had with Maine Eye Care Associates (MECA). Second, there is a question of whether Drs. Gorman and Cravey violated some duty to MECA as the result of their handling of the MECA practice in Ellsworth. A separate issue, in the event that the court finds for the plaintiff as to either of the two just mentioned, is the measure of damages.

**Facts**

For some period prior to December 1994, Dr. Madison Cravey (Cravey) conducted an ophthalmic practice in Ellsworth, Maine. At the end of 1994, Cravey sold his practice to MECA for $203,500 (apparently not including real estate). For accounting

purposes, the purchase price was allocated primarily to tangible personal property, which could then be depreciated. However, the agreement also recognized that medical records and charts would be included among the assets being purchased. Following the sale of his practice, Dr. Cravey entered into an employment agreement with MECA dated December 30, 1994, and continued treating his former patients as an employee of MECA.

Dr. Timber Gorman began practicing as an ophthalmologist in 1996, when she was hired by MECA to join the staff of their Ellsworth office. There she joined Dr. Cravey and one other doctor as the medical staff of the MECA practice. On July 5, 1996, and again on August 26, 1997, Gorman entered into employment agreements with MECA. Unlike Cravey's agreement, Gorman's included a non-competition provision that would forbid her from practicing medicine in competition with MECA in the event that she either voluntarily terminated her employment or was dismissed by MECA. This limitation would affect medical practice for a period of 18 months from the date of termination or dismissal and within a radius of 30 miles of any MECA office or lab. The agreement also included a provision that notwithstanding the termination of the employment agreement, the parties would still be required to carry out the provisions of the non-competition provision. This court has already concluded that this continuing agreement kept alive the non-competition provisions even after the employment agreements themselves had terminated.

In 1998, the CEO of MECA proposed a new employment agreement or, apparently, that Gorman become one of the MECA associates. Concerned about some of the terms in the agreement, Gorman did not sign the agreement or join the firm, though she continued as an employee of MECA.

Beginning in May of 1999 through 2000, there was a growing concern on the part of MECA about the operations in their Ellsworth office. This concern is exemplified in plaintiff's exhibits 35 through 38. In a nutshell, MECA thought that the Ellsworth staff was not seeing as many patients as it could and this weakness in revenue, combined with high overhead, was causing the office to actually lose money. The parties agree that by the Fall of 2000, MECA had decided to cut its losses by divesting itself of the Ellsworth practice. However, the parties do not agree concerning the circumstances and intent of what occurred next. The plaintiff claims that in divesting itself of the Ellsworth practice, the plan was that Drs. Gorman and Cravey would purchase or repurchase the practice and continue running it themselves. In order to give Gorman and Cravey time to arrange their financing without interrupting the practice, MECA would lease office space, equipment and use of its charts and files to the doctors for a limited period. On the other hand, Gorman and Cravey argue that they never intended to purchase the practice from MECA and that they never signed any purchase and sale agreements or leases, though they did pay MECA approximately $65,000 presumably for rent of the premises, equipment and charts. The plaintiff's argument is supported by testimony and its exhibits 39 through 48 plus 50 and 51. The doctors' argument is supported by their testimony.

As part of MECA's divesting of the Ellsworth practice, termination letters were sent to Dr. Cravey on September 29, 2000, and to Dr. Gorman on October 26, 2000, to be effective in both cases as of January 1, 2001. However, even as these letters notified the doctors of the termination of their employment, they also contained the skeleton of the process to transfer the practice from MECA to the doctors. As of January 1, 2001, Gorman and Cravey continued offering ophthamological services to the same patients previously serviced for MECA and in the same location, under the name "Downeast

Eye M.D. " This change in name and announcement that MECA would no longer be the entity providing eye care services was publicized to prior patients and the public. On November 1, 2001, Downeast Eye M.D. moved out of the MECA building into a new location, taking with them MECA's patient files, but leaving behind most of the older equipment.

After reviewing all of the evidence and assigning credibility to the witnesses' testimony, the court further finds by a preponderance of the evidence that the plaintiff's version of what was intended and what transpired during this period is the more accurate rendition of the facts.

## Discussion

Count I of the complaint concerns the "non-competition" provision of Gorman's 1997 employment contract with MECA. This provision was an important part of the employment contracts of 1996 and 1997, and remained in effect under the terms of the contract, even after the rest of the employment agreement expired. Therefore, this provision was still in effect as of January 1, 2001, when Gorman's employment with MECA ended. The scope of the prohibition – no practice within 30 miles for 18 months – was reasonable and enforceable. There remains a question of whether under these unique circumstances the continued practice by Gorman was a breach of this prohibition.

There is no dispute that Gorman continued the practice after January 1, 2001, so that she was within both the time limitations of the provision. However, Gorman continued this practice with not only the knowledge but also the blessing of MECA, since MECA was under the belief that Dr. Gorman was going to purchase the practice from MECA within the year. The real question is whether there was any competition to prevent in November 2001.

It is clear from the evidence of record that MECA intended to divest itself of the Ellsworth practice in order to cut the losses it had suffered during the preceding couple of years. However, MECA had paid over $200,000 for this practice just six years earlier and it retained considerable value even though the income flow was negative. With the exception of the defendants' self-serving testimony, which the court did not find entirely credible, the evidence indicates the intent on MECA's part to divest itself of the practice by selling it to someone else, particularly Gorman and Cravey. The result is that between January 1, 2001, and November 1, 2001, MECA was out-of-business and out of its operations in Ellsworth. The only remaining tie between MECA and the former Ellsworth practice was its receipt of rental payments from the defendants and its anticipated sale of the practice to them. The result is that by the time in late 2001 that MECA started to talk about enforcing the non-competition provision (plaintiff's exhibit 57), MECA was no longer in competition in the Ellsworth market. MECA was no longer managing the Ellsworth practice and had no intent to resume it, as indicated by the fact that it is not seeking injunctive relief with regard to the non-competition provision. Therefore, even though the contractual provision was still in effect and Dr. Gorman remained practicing medicine in Ellsworth, that practice was no longer within 30 miles of a MECA office or lab.

The court will order judgment for the defendants on count I – non-competition covenant – for the reasons just stated. It will also order judgment for the defendants on count II – breach of fiduciary duty as employees of the plaintiff – because the defendants were not employees of the plaintiff at the critical point in time. The defendants will also receive judgment on count VII – violation of duty of good faith and fair dealing – because this transaction was not subject to the UCC. That leaves the

plaintiff's claims under count III – unjust enrichment – and count IV – fraudulent misrepresentation.[1]

Turning to the second major issue, which the plaintiff styles "theft of practice," the court concludes that the plaintiff is entitled to recovery under either of the two theories. The court has already found that it was more impressed with the accuracy and credibility of the version of events related by the plaintiff. As MECA decided to divest itself of the Ellsworth practice, it initiated discussions with Gorman and Cravey for purchase of the practice. The short-term lease arrangement and continued treatment of MECA patients by Gorman and Cravey are fully consistent with such understandings, even though the final contracts had never been signed. It is a fair inference from the evidence that Gorman did not want to purchase the over-large building or much of the older equipment that MECA had purchased from Cravey in 1994. However, Gorman did want to purchase the real "guts" of the practice -- the patients' charts and the good will and continued business, which they represented. By holding off further negotiation and final agreement of purchase and sale, Gorman got exactly what she sought. Gorman, with Cravey as her employee, took over all of MECA's patients in a new location with more modern equipment, leaving MECA with the overhead, which was at least partially to blame for the previous failure of that practice. With lower overhead and more efficient management, Gorman almost immediately was able to turn the practice into a handsome moneymaker. Although Gorman paid the plaintiff $65,000 in rent for the premises, equipment and use of the patient charts, she now has continued possession of all of the charts without any further payment to the plaintiff.

---

[1] The plaintiff withdrew counts V and VII at the time of trial.

Based on the foregoing, the court concludes that the plaintiff is entitled to judgment under count III because it would be unjust for defendant Gorman to retain the benefit of all of the client charts and records without any compensation for them, especially since Gorman testified that she initially expected to have to purchase those files. The plaintiff is also entitled to judgment on count IV because the court finds it reasonable to infer from the correspondence of record that Gorman and Cravey led MECA on in believing that there would be a purchase of the practice when there was no intent to do so.

The remaining issue concerns the measure of damages. When the anticipated purchase of the practice fell through, the plaintiff was able to offset much of its losses through the sale of the building and either sale on the used equipment market or reuse of the equipment in one of its other locations. This equipment had already been almost entirely depreciated for tax purposes in any event. The real value of the practice lay not in its tangibles but in the good will of the practice as represented by the patients' charts. Therefore, an appropriate and equitable measure of damages in this case would focus on this asset. According to the testimony of Mr. Pernell, there were 11,784 patient charts active during 2001 at Downeast Eye M.D. which had been brought along from the MECA office. The cost imposed by the plaintiff for copying a file ($15) provides at least some basis upon which to assign a value to the files retained by Gorman. Multiplying 11,784 charts times $15 equal $176,760. The court finds this to be an appropriate measure of damages. Since Cravey is now working for Gorman as a salaried employee, he is not gaining any unjust enrichment and will not be required to share in the judgment.

For the reasons stated above, the entry will be:

Judgment for the defendant on all counts as to defendant Dr. Cravey; judgment as to defendant Dr. Gorman on counts I, II and V; judgment for the plaintiff against defendant Dr. Gorman on counts III and IV in the amount of $176,760 plus costs and interest.

Dated: November 18, 2004

S. Kirk Studstrup
Justice, Superior Court

Attorney for: MAINE EYE CARE ASSOCIATES PA

BERMAN & SIMMONS
PO BOX 961
129 LISBON STREET
LEWISTON ME 04243-0961


vs
TIMBER GORMAN MD - DEFENDANT

Attorney for: TIMBER GORMAN MD
BERNARD KUBETZ   - RETAINED
EATON PEABODY
80 EXCHANGE ST
PO BOX 1210
BANGOR ME 04402-1210


G MADISON CRAVEY MD - DEFENDANT

Attorney for: G MADISON CRAVEY MD
BERNARD KUBETZ   - RETAINED
EATON PEABODY
80 EXCHANGE ST
PO BOX 1210
BANGOR ME 04402-1210

SUPERIOR COURT
KENNEBEC, ss.
Docket No   AUGSC-CV-2002-00217

**DOCKET RECORD**

Filing Document: COMPLAINT                    Minor Case Type: CONTRACT
Filing Date: 10/15/2002

## Docket Events:

10/15/2002 FILING DOCUMENT - COMPLAINT FILED ON 10/15/2002
          Plaintiff's Attorney:  WILLIAM ROBITZEK
          WITH ATTACHED EXHIBITS, FILED

10/15/2002 Party(s):  MAINE EYE CARE ASSOCIATES PA
          ATTORNEY - RETAINED ENTERED ON 10/15/2002
          Plaintiff's Attorney: WILLIAM ROBITZEK

10/15/2002 Party(s):  MAINE EYE CARE ASSOCIATES PA
          DISCOVERY FILING - NOTIFICATION DISCOVERY SERVICE FILED ON 10/15/2002
          Plaintiff's Attorney:  WILLIAM ROBITZEK
          PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED UPON DEFENDANTS SERVED ON
          NATHANIEL PUTNAM & G. MADISON CRAVEY ON 10/4/02, FILED.

10/15/2002 CERTIFY/NOTIFICATION - CASE FILE NOTICE SENT ON 10/15/2002
          ISSUED TO WM ROBITZEK, ESQ.

10/18/2002 Party(s):  G MADISON CRAVEY MD
          SUMMONS/SERVICE - CIVIL SUMMONS FILED ON 10/18/2002
          AS TO DEFENDANT MADISON CRAVEY MD., FILED.

10/18/2002 Party(s):  G MADISON CRAVEY MD